## IN THE MATTER OF THE ADOPTION OF
## S.J.B., a Minor
## D.J.B. and K.B.B., Adoption Services, Inc., et al.,
## Appellants

87-277                                      745 S.W.2d 606

### Supreme Court of Arkansas
### Opinion delivered February 29, 1988

*Wright, Lindsey & Jennings*, for appellant.

JOHN I. PURTLE, Justice. On July 9, 1987, at the age of fifteen, June Roe, unmarried, gave birth to Baby Roe (pseudonyms) as a result of an isolated sexual encounter with the biological father. The father apparently is unaware of the birth of the child. The mother has not disclosed the identity of the biological father; nor has she made any effort to notify him of the child's birth. She declined to reveal the identity of the biological father for reasons of religion and privacy. Shortly after the birth of the baby boy she executed a "Consent to Adoption and Waiver and Entry of Appearance" in favor of the adoption agency. This document was also executed by a guardian ad litem who had been appointed to assist and advise June Roe during these proceedings. Adoption Services, Inc., then placed the child with D.J.B. and K.B.B., who subsequently filed a petition for adoption of the child in the Pulaski Probate Court.

After a hearing on the petition the trial court found that the adoption was proper in all respects except that the father had not received notice. While acknowledging that the applicable

Arkansas statutes (Ark. Code Ann. §§ 9-9-206 and 207 (1987)) do not require notice to the father in this case, the court sua sponte held that the lack of notice to the father was a violation of both Due Process and Equal Protection. The court then stayed the pending adoption proceeding "until such time as evidence of notice to the father of its pendency is submitted to the Court." This effectively terminated the adoption proceeding. (See Rules of Appellate Procedure Rule 2(a)(2).) The only issue presented to this court is whether under the circumstances of this case notice to the father is mandated by the Equal Protection and Due Process Clauses of the United States Constitution. We hold that notice to this father of the adoption proceedings is not required.

Arkansas' Revised Uniform Adoption Act is contained in Ark. Code Ann. §§ 9-9-201 through 223 (1987). Chapter 9 section 206 enumerates those persons who are required to consent to an adoption; subsection (a)(2) requires the written consent of the father of the minor "if the father was married to the mother at the time the minor was conceived or at any time thereafter, the minor is his child by adoption, he has custody of the minor at the time the petition is filed, or he has otherwise legitimated the minor according to the laws of the place in which the adoption proceeding is brought." Section 207 lists persons as to whom notice and consent are not required; subsection 207(a)(3) reads as follows: "The father of a minor if the father's consent is not required by 9-9-206(a)(2)."

The language of the Arkansas statutes is clear that notice to the father in this case is not required unless he has "otherwise legitimated" the child. He obviously meets none of the other statutory criteria which would entitle him to notice.

The biological father was not interested enough in the outcome of his sexual encounter with this fifteen year old girl to even inquire concerning the possibility of her pregnancy. As far as we can discern from the record, he has exhibited absolutely no interest whatsoever in the child. It is probably true that he does not know of the existence of the child. Under this factual situation we must determine whether the Arkansas statute allowing adoption without notice to the father is constitutional.

We are not dealing here with a situation where the unwed father had a significant relationship with the children as was the

case in *Stanley* v. *Illinois*, 405 U.S. 645 (1972) and *Caban* v. *Mohammed*, 441 U.S. 380 (1979). We are instead dealing with the situation where the father is merely "the biological link" which brought the child into existence.

The U.S. Supreme Court has examined the extent to which a natural father's biological relationship with his child receives constitutional protection in four cases. In *Stanley* v. *Illinois*, supra, the Court held that the Due Process Clause was violated by the automatic destruction of the parental rights of a father who had had a custodial relationship with his children without giving the father any opportunity to present evidence regarding his fitness as a parent. *Quilloin* v. *Walcott*, 434 U.S. 246 (1978), upheld the constitutionality (under both the Due Process Clause and the Equal Protection Clause) of a Georgia statute that authorized the adoption of a child over the objection of the natural father who had never legitimated the child. In *Caban* v. *Mohammed*, supra, the Court ruled that it violated the Equal Protection Clause to grant the mother a veto over the adoption of two children, but not to grant a veto to their father, who had admitted paternity and had participated in the rearing of the children; the Court held that such statutes may not distinguish between a mother and father who are in fact similarly situated with regard to their relationship with the child. (The majority in *Caban* did not address the Due Process argument.)

In *Lehr* v. *Robertson, et al.*, 463 U.S. 248 (1983), the Court held that an unmarried father lacking a custodial, personal, or financial relationship with the child was not constitutionally entitled to notice of the child's adoption proceeding. The father in *Lehr* filed a petition to vacate the order of adoption of his child. The child had been adopted when she was over two years old by the mother and the mother's husband. The biological father had lived with the mother prior to the child's birth and had visited the mother in the hospital when the child was born. However, he did not live with them after the birth, he never provided them with any financial support, and he never offered to marry the mother. Moreover, the father had not entered his name in New York's "putative father registry," which would have entitled him to receive notice of the adoption proceeding. The natural father was not a member of any class of possible fathers who were required by the New York statute to receive notice of the adoption

proceeding. However, the father had filed a "visitation and paternity petition" one month after the adoption proceeding had been commenced. He subsequently learned of the pending adoption proceeding and attempted to intervene.

The Supreme Court in *Lehr* held that until an unwed father demonstrates a full commitment to the responsibilities of parenthood by coming forward to participate in the rearing of his child, his interest in personal contact with his child does not acquire substantial protection under the Due Process Clause. Said in other words, when the father acts like a father and takes on some of the responsibilities of fatherhood, he is entitled to be treated as a father. The *Lehr* Court expressly stated: "But the mere existence of a biological link does not merit equivalent constitutional protection." The *Lehr* opinion concluded the Due Process discussion:

> The Constitution does not require either a trial judge or a litigant to give special notice to nonparties who are presumptively capable of asserting and protecting their own rights. Since the New York statutes adequately protected appellant's inchoate interest in establishing a relationship with Jessica, we find no merit in the claim that his constitutional rights were offended because the Family Court strictly complied with the notice provisions of the statute. [463 U.S. at 265]

The Fourteenth Amendment to the United States Constitution provides that no state shall deprive any person of life, liberty, or property without due process of law. When the Due Process Clause is invoked, the first step in the inquiry is to determine the precise nature of the private interest that is threatened by the state. *Lehr*. The parent-child relationship is a basic fabric of our society. There can be no doubt that this relationship merits constitutional protection unless the circumstances are exceptional. The states have traditionally been allowed to control matters of marriage, divorce, adoption, inheritance of property, and child custody. Society has always expressed a preference for formal families, and married parents generally have been considered to have equal authority over, and rights to, their children. It is clear from the foregoing discussion and the circumstances of this case that this father's inchoate

relationship with his child is not entitled to "equivalent constitutional protection" under the Due Process Clause.

The Equal Protection Clause requires that states may not draw distinctions between individuals or groups of individuals based solely on differences irrelevant to a legitimate governmental objective. *Reed* v. *Reed*, 404 U.S. 71 (1971). Again we find that *Lehr* controls the present appeal. The Court in *Lehr* stated: "We have held that these statutes may not constitutionally be applied in that class of cases where the mother and father are in fact similarly situated with regard to their relationship with the child." The Court concluded this portion of the opinion:

> If one parent has an established custodial relationship with the child and the other parent has either abandoned or never established a relationship, the Equal Protection Clause does not prevent a state from according the two parents different legal rights. [463 U.S. at 267]

The mother and father in this case are not similarly situated with regard to their relationship with the child. Moreover, the father is not similarly situated with any class of fathers entitled to receive notice under the statute. Under the circumstances of the present appeal, the Equal Protection Clause does not entitle this father to notice of the adoption proceeding.

It is apparent from *Stanley* and *Caban* that an unwed father who has entered into a sustained relationship with the mother of his illegitimate child, or with the child, is entitled to notice of an adoption proceeding. However, it is clear from *Lehr* that a parent lacking a custodial, personal, or financial relationship with his child is not constitutionally entitled to notice. We agree with the appellants' statement that the question is not so much whether the state may terminate the father's parental rights without notice, but whether parental rights attached in the first place.

The Arkansas law governing the establishment of paternity by the county court is applicable to all putative fathers. See Ark. Code Ann. § 9-10-104 (1987). In the present case, the putative father did not avail himself of this procedure, nor did he take any affirmative action concerning his paternity or inquire about the possibility of his fatherhood. We therefore conclude that an unmarried father lacking any substantial relationship

with his child is not entitled to notice of the child's adoption proceeding under either the Due Process Clause or the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution.

HOLT, C.J., and GLAZE, J., concur.

DUDLEY and NEWBERN, JJ., dissent.

TOM GLAZE, Justice, concurring. While I join the majority in its result, I do so with some reservations because a strong meritorious argument exists that Arkansas's statutory scheme fails to provide putative fathers the procedural due process that has been enunciated in at least four United States Supreme Court decisions. The majority court sets out those decisions, and, in three of them, the putative fathers had knowledge of the illegitimate child *and* had the opportunity to establish a relationship with the child. In the latest decision, *Lehr* v. *Robertson*, 463 U.S. 248 (1983), the putative father knew his child had been born, but had no opportunity to have a relationship with her. When comparing those Supreme Court cases to the one at bar, we find another deviation in the facts, since, here, the unwed mother, knowing the putative father's identity, apparently failed to apprise him that she was pregnant or that she delivered his child. A brief review of the four Supreme Court decisions involving putative father rights will quickly point out why the notice provisions of Arkansas's adoption laws are constitutionally suspect, and why that issue was raised by the trial judge in this case.

In *Stanley* v. *Illinois*, 405 U.S. 645 (1972), the Supreme Court held that the due process clause of the fourteenth amendment entitled Stanley, a putative father, to a hearing on his fitness as a parent. Six years later, the Court decided *Quilloin* v. *Walcott*, 434 U.S. 246 (1978), wherein it limited the new parental right given putative fathers under *Stanley* by indicating that if a putative father fails to show a substantial interest in his child's welfare, he will not receive the full constitutional protection afforded the rights of other parents. *Id.* at 254-56. The Supreme Court next considered the rights of the putative father in the case of *Caban* v. *Mohammed*, 441 U.S. 380 (1979), wherein the Court held a New York law violated the equal protection clause of the fourteenth amendment because the law denied an unwed father the same power to oppose his illegitimate

child's adoption as the unwed mother. In *Caban*, the quality of Caban's relationship with his children convinced the Court that the unwed father and mother were similarly situated and could not be statutorily distinguished on the basis of sex.

Finally, in 1983, the Supreme Court considered the constitutional protection afforded a putative father's relationship with his illegitimate child in a procedural due process context. In *Lehr* v. *Robertson*, 463 U.S. 248 (1983), the Court reiterated its position that a putative father's attempts to establish a substantial relationship with his child will determine the constitutional protection afforded that relationship. However, the *Lehr* Court also clearly informed the states that they must at least protect the putative father's opportunity to form a relationship with his child. *Id.* at 262-65. In considering this procedural due process question, the Court reviewed New York's statutory scheme, which the state adopted to protect the unmarried father's interest in assuming a responsible role in the future of his child. The Court said:

> After the Court's decision in *Stanley*, the New York Legislature appointed a special commission to recommend legislation that would accommodate both the interests of biological fathers in their children and the children's interest in prompt and certain adoption procedures. The commission recommended and the legislature enacted, a statutory adoption scheme that automatically provides notice to seven categories of putative fathers who are likely to have assumed some responsibility for the care of their natural children. If this scheme were likely to omit many responsible fathers, *and if qualification for notice were beyond the control of an interested putative father, it might be thought procedurally inadequate.* Yet, as all of the New York courts that reviewed this matter observed, the right to receive notice was completely within appellant's control. By mailing a postcard to the putative father registry, he could have guaranteed that he would receive notice of any proceedings to adopt Jessica [Lehr's child]. [Emphasis added.]

*Id.* at 263-64. While the Supreme Court held that the New York statutes adequately protected Lehr's inchoate interest in estab-

lishing a relationship with his child, the Court clearly did so because the New York law provided a means by which Lehr—by filing with the "putative father registry"—would have received notice of any adoption proceeding involving his putative child.

Arkansas's statutory scheme fails to provide the notice or procedural safeguards the New York laws afforded putative fathers in *Lehr*. There, the unwed mother, throughout her pregnancy and after she gave birth, acknowledged to others that Lehr was the child's father. However, after she was discharged from the hospital, she concealed her whereabouts, and although Lehr made substantial efforts to find her, he was unable to locate the mother until after she had married a Mr. Robertson. Lehr commenced a legitimacy proceeding, but was unaware (because of lack of notice) that an adoption proceeding had been instituted. On these facts, the *Lehr* Court disregarded Lehr's due process argument that he should have received notice of the adoption proceeding, and the Court did so premised on the fact that Lehr had failed to assure his right to notice by registering as a putative father, as required by the New York law.

Unlike New York's law, Arkansas's statutes would not have availed Lehr (or someone in his situation) any procedural notice to assure him an opportunity to establish a relationship with his child. In fact, Ark. Code Ann. §§ 9-9-206(a)(2) and -207(a)(3) (1987) require notice to and consent of a father whose child is to be adopted only if: (1) the father was married to the mother at the time the minor was conceived, or at any time thereafter, (2) the minor is his child by adoption, (3) the father has custody of the minor at the time the petition is filed, or (4) he has otherwise legitimized the minor. Clearly, under these provisions, a putative father in Lehr's situation could not qualify for notice of any adoption proceeding involving his child. Under such circumstances, Arkansas's adoption law would have altogether failed to meet the test of procedural due process as set out in *Lehr* because our state's statutory scheme fails to protect a putative father's opportunity to form a relationship with his child.

Of course, the same would seem true for a putative father whose identity is known to the unwed mother, but for her own reasons, the mother chooses not to reveal to the putative father that she is pregnant, much less inform him she gave birth to his

child. Under these facts—which are the ones before us now—how does a putative father establish a substantial relationship with his child? No notice that discloses the unwed mother bore his child, gave birth to it and placed the child for adoption is given to the putative father, and none is required by this state. At least one jurisdiction has held, under almost identical facts, that such notice is not required. *See P and P* v. *Children's Services Div.*, 66 Or. App. 66, 673 P.2d 864 (1983).

*P and P* obviously is not binding precedent here, but, confronted with a similar law and on facts that are almost identical to those presented here, the Oregon courts have upheld the constitutionality of their state's adoption-notice statute as it relates to putative fathers. *Id.; see also Burns* v. *Crenshaw*, 84 Or. App. 257, 733 P.2d 922 (1987). Arkansas's adoption-notice provision has been in effect since 1977, and until now, its constitutionality has been unchallenged. Even now, no putative father raises the constitutionality of §§ 9-9-206(a)(2) and -207(a)(3). Arkansas law is settled that every reasonable doubt must be resolved in favor of constitutionality of a statute, and the fact that a statute has been in effect for a long period of time without its validity having been questioned, while not conclusive, is highly persuasive of its constitutional validity. *S. Cent. Dist., Pentecostal Church* v. *Bruce-Rogers*, 269 Ark. 130, 599 S.W.2d 702 (1980).

As already noted, a putative father has never challenged Arkansas's adoption-notice provisions, nor does one do so now. Instead the trial court here raised the issue, and although the court was justified in doing so, it bears the burden of overcoming the strong presumption that the law is constitutional. While I have some doubts of my own concerning the constitutionality of Arkansas's law as it relates to the lack of notice given to putative fathers, I am uneasy in holding that law unconstitutional, especially when a comparable law has been upheld in another jurisdiction. *See P and P*, 66 Or. App. 66, 673 P.2d 864.

Nonetheless, I would be remiss not to at least point out (as I have tried to do) why I think Arkansas's adoption-notice law might be constitutionally suspect and why I believe Arkansas's notice provision could need remedial attention. In doing so, I am mindful of the problems such a notice poses to the privacy interest

of an unwed mother. The Oregon Court in *P and P* discussed such a privacy interest and that interest assuredly was a factor when that court decided a putative father was entitled to no notice unless he came forward to assume the responsibilities of parenthood.

The question still remains, however, as to how a putative father assumes the responsibility of parenthood if he does not know the child exists? New York, by adopting a law that establishes a putative father registry, has provided a notice procedure to the father and at the same time, minimized an unwed mother's privacy problem. That law has now passed constitutional muster, at least to the extent warranted by the facts in *Lehr*. Accordingly, our General Assembly should adopt the New York law, or a similar procedure, in order to ensure the constitutionality of Arkansas's adoption-notice law. Hopefully, in considering such legislation, the General Assembly will weigh and be mindful of the privacy interests of unwed mothers.

HOLT, C.J., joins in this concurrence.

ROBERT H. DUDLEY, Justice, dissenting. There is no final order in this case as required by Ark. R. App. P. 2(a), and I would dismiss the appeal for lack of jurisdiction. Accordingly, I dissent.

DAVID NEWBERN, Justice, dissenting. I agree with the majority decision as to the merits of the case. However, I would not reach the merits because I would dismiss the appeal for lack of a final order. The probate court stayed the adoption pending a showing of notice to the putative father of the child to be adopted. An adoption may be appealed only if a final order has been entered, as in any other civil case. Ark. Code Ann. § 9-9-216 (1987); Ark. R. App. P. 2(a). While we have ruled that an interlocutory order of adoption qualifies as a final order if no subsequent hearing is required by the decree, *In re Appeals from Adoption Orders*, 277 Ark. 520, 642 S.W.2d 573 (1982), here we do not have an interlocutory adoption order. The action is obviously still pending.

When there is no final order, this court lacks jurisdiction of the subject matter of the appeal, and we have a duty to raise the issue and dismiss the case. *Hyatt* v. *City of Bentonville*, 275 Ark. 210, 628 S.W.2d 326 (1982); *Roy* v. *International Multifoods Corp.*, 268 Ark. 958, 597 S.W.2d 129 (1980).

I respectfully dissent.